## Board of Park Commissioners of the City of Louisville, et al. v. Speed, et al.

(Decided June 25, 1926.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Parties—Defendants Waived Defect of Parties in Plaintiffs' Incapacity to Sue, where They Filed Only a General Demurrer (Civil Code of Practice, Sections 92, 118).—Defendants waived defect of parties plaintiff arising from plaintiffs' incapacity to sue, in view of Civil Code of Practice, sections 92 and 118, where they did not specially demur thereto, but filed only a general demurrer, though their answer, as amended, denied authority of plaintiffs to bring the action, where facts producing incapacity to sue appeared on face of pleading.

2. Municipal Corporations—Taxpayers Held Entitled to Enjoin Park Commissioners and Memorial Commission from Executing Contract for Construction of Memorial Auditorium in Park.—Citizens and taxpayers who were also liberal subscribers to fund raised to supplement bond issue for construction of auditorium by memorial commission held entitled to maintain action to enjoin board of park commissioners and memorial commission from executing a contract whereby former granted to latter right to con-

struct a memorial auditorium in city public park, notwithstanding. failure on plaintiffs' part to show special and peculiar injury.

3.   Municipal Corporations—Contract by which Park Commissioners. Granted to Memorial Commission Right to Construct Memorial, Auditorium in Park, to be Under Control of Commission, Held Invalid (Ky. Stats., Sections 2840-2859; Acts 1922, c. 23).—Contract by which board of park commissioners of Louisville granted to memorial commission, created by Acts 1922, c. 23, right to construct a memorial auditorium in city public park, to be under control of commission, held invalid, in view of Ky. Stats., sections 2840-2859, manifesting intent that all park property should be in exclusive custody and control of park board, in trust for public park purposes, though board reserved control over part of basement of building to be erected.

W. T. BASKETT for appellant Board of Park Commissioners.

PETER, LEE, TABB & KRIEGER, CHURCHILL HUMPHREY and ARTHUR PETER for appellant Louisville Memorial Commission.

ALEX G. BARNETT, EDMUND F. TRABUE and JAMES W. STITES for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Affirming.

Appellees, Hattie Bishop Speed and twenty-one other citizens and taxpayers of the city of Louisville, as plaintiffs below, filed this equity action in the Jefferson circuit court for and on behalf of themselves and the other citizens and taxpayers of the city against the Board of Park Commissioners of the city, and the Louisville Memorial Commission, and the members of each as individuals, to enjoin the park board (to which we shall hereafter refer as the board) and its members, and to enjoin the Louisville Memorial Commission (to which we shall hereafter refer as the commission) and its members from carrying out or executing a contract entered into between the board and the commission on June 19, 1925, whereby the former granted to the latter the right and privilege for it to construct a memorial auditorium in Central Park in the city of Louisville, and which park is located between Fourth and Sixth streets and contains between fifteen and eighteen acres.

The grounds upon which the relief was sought were that the board in granting the privilege contained in the contract to surrender its control over the large auditorium contemplated after its construction, violated the provisions of the statute creating it, and exceeded its

authority as therein set forth by delegating to the commission the exclusive control of a substantial portion of the park when the legislature gave it and enjoined upon it the exclusive control of all of it. It was also insisted in the petition that the auditorium and the purposes to which it was to be devoted under the terms of the statute under which the commission was created were not (or at least some of them) park purposes, and to permit the contract to be carried out would surrender a portion of the park to the commission to be perpetually used for other than park purposes. The commission was sought to be enjoined from carrying out the contract upon the ground that the statute creating it enjoined upon it the exclusive control and management of the auditorium which it should construct, and that under the contract between it and the board it obligated itself to surrender control over a portion of the auditorium to the board, and to that extent, at least, the contract if carried out would violate the terms of its creating statute, and thereby both as to it and the board the contract was *ultra vires* and void. The learned judge who presided below sustained the contentions of plaintiffs and perpetually enjoined the board and the commission from executing the contract, and to reverse that judgment defendants prosecute this appeal.

A brief examination into the authority and duties of both the board and the commission is necessary and pertinent. The law creating the board and prescribing and limiting its powers and duties is contained in sections 2840-59 of our present statutes, being a part of charters of cities of the first class. Section 2840 prescribes that all public parks in the city "shall be held, managed and controlled by the board." Following sections designate the powers and duties that it may and must exercise under its general power of management and control, including police powers. Section 2850 says, in part: "The title to all property acquired for park purposes shall vest in the Board of Park Commissioners, and the same, with all the improvements and equipments, shall be held in strict and inviolable trust for public park uses," &c. Section 2858 defines what shall constitute "park property," the exclusive control and management of which is delegated to the board and the title to which it holds in trust for the enumerated purposes, thus: "The term park property includes all parks, squares and areas of land within the

management of said board; and all buildings, structures, improvements, seats, benches, fountains, walks, drives, roads, trees, plants, herbage, flowers and other things thereon, and inclosures of the same; . . . and all birds, animals or curiosities, or objects of interest or instruction placed in or on any of such inclosures, ways, parkways, roads or places; and said terms shall be liberally construed.''

The act creating and defining the powers and duties of the commission is chapter 23, Acts of 1922, page 79, and its purpose was to authorize the citizens of the city of Louisville in the manner therein prescribed to erect an appropriate memorial to the soldiers furnished by the city and the county of Jefferson to the army and navy of the United States in the World War, and prescribed that a portion of the fund necessary for the purpose might be raised by a bond issue by the city in the manner therein provided for, and such fund should be supplemented by an additional amount of $500,000.00 raised otherwise than by taxation. That amount was raised by voluntary subscriptions and plaintiffs were liberal donators and the bonds of the city were voted by an election duly and regularly called, which, with the donation, made a fund of $1,250,000.00 to be expended by the commission in carrying out the purposes of the act. Section 6 of the act provided, among other things, that: ''Said commission may acquire by gift, purchase, lease or by condemnation, any land or property situated wholly within such city or county, or any interest, franchise, easement, right or privilege, in said city or county, or any building, tools, machinery, materials, or supplies, which may be required for the purpose of constructing, furnishing, maintaining or operating such memorial. . . . All property acquired by the commission shall be held, used, owned and controlled by it, for the purposes named in this act.'' And section 23 says: ''All of the funds realized from the sale of the aforesaid bonds, if voted, together with the aforesaid gifts or donations or funds, aggregating not less than five hundred thousand dollars ($500,000.00) additional, shall be expended by the commission for the acquirement of necessary ground and for the construction and equipment of said memorial, as provided for in this act; and the title to all such property, however acquired, shall vest in said commission, and shall be held and used in strict and inviolable trust for the purposes contemplated by this act.''

The contract assailed stipulates that the board "gives and grants to the Louisville Memorial Commission, its successors and assigns, the right to erect and maintain a memorial structure upon that portion of Central Park in the city of Louisville shown upon the plat attached," &c. It is further provided and stipulated, that: "It is hereby mutually agreed that upon the completion of the memorial, the (park) board shall have complete custody, control and management of that portion of the said structures designed to replace and increase the facilities contained in the existing buildings in Central Park, such portion being enclosed within a red line on the floor plans filed herewith as part hereof (about one-fourth of the basement), marked for identification 'Exhibit A,' and that the (memorial) commission shall have the complete custody, control and management of the remainder of said memorial structure;" and that, "The (memorial) commission and the (park) board, each, agree to maintain order in and to accept full responsibility for the preservation of that part of the structure under their respective management." The plaintiffs contend that the board exceeded its rights when it attempted in the contract to surrender its management and control of the building to be erected by the commission, since under the statutory definition *supra*, the park property placed under its exclusive management and control includes all buildings upon the park grounds; and that the commission likewise surrendered its enjoined control over that portion of the proposed memorial structure wherein it surrendered control to the board, and those contentions present the first question for consideration on the merits. If it should be answered in favor of plaintiffs there will be no necessity in discussing or determining the other question on the merits, *i. e.*, whether the building and its uses as contemplated may be classified as "park purposes;" it being contended by plaintiffs that it would not and that to do so would be a devoting of a portion of the park to other than park purposes, which, it is conceded by defendants, can not be done under the present condition of the law on the subject, if the structure and its uses are not "park purposes."

Before considering the first question on the merits a preliminary one is presented, which is, that plaintiffs show no right in themselves to maintain this action, and which in effect is that there is a defect of parties plain-

tiffs. Section 92 of our Civil Code of Practice, says: "A special demurrer is an objection to a pleading which shows . . . . That there is a defect of parties, plaintiff or defendant." The facts upon which it was claimed the plaintiffs had the right to maintain the action were all set forth in the petition. Each of them was and is *sui juris* and had legal capacity to sue, provided they sustained such a relationship to the subject matter and the relief sought that they in their private capacities could maintain the action. If it was made to appear upon the face of their petition that they sustained no such relationship, then there was an apparent defect of parties plaintiff and under such circumstances grounds for a special demurrer were presented. In the cases cited in the notes to that section it is shown that where the defect in parties appears on the face of the pleading, the only objection that may be made to it by the adverse litigant is by a special demurrer, and that a general demurrer is insufficient for the purpose. Furthermore, that if the defect is not taken advantage of in that manner, and a meritorious defense is interposed by general demurrer or answer the defect is waived and can not thereafter be insisted on. Under those opinions and others rendered since then it would seem that defendants waived the defect in this case, since they did not specially demur to the petition, but filed only a general demurrer thereto and which raised only meritorious questions in the case. It is true that in their answer as amended they denied the right or authority of plaintiffs to bring the action on behalf of themselves and other taxpayers or property owners, but the question of practice may not be raised or presented in that manner, unless the facts producing the incapacity to sue do not appear upon the face of the pleading responded to, in which case only is it proper to present the objection by a pleading, as is provided by section 118 of the same Code of Practice.

Waiving the point of practice, however, and deciding the question upon its merits, we entertain no doubt of the right of plaintiffs under the facts of this case to maintan the action. In 4 Dillon on Municipal Corporations, 5th edition, section 1579, it is pointed out that taxpayers in a municipal corporation may maintain this character of action where the public functionaries of the municipality are "making an unauthorized appropriation of the corporate funds or an illegal or wrongful disposi-

tion of the corporate property. . . . The equity jurisdiction may, in such cases, usually rest upon fraud, *breach of trust,* multiplicity of suits, or the inadequacy of the ordinary remedies of law." (Our italics). In the following section (1580) the learned author says that the doctrine which permits the citizen to maintain such a suit, within the prescribed limitations, is analogous to the rule applied to private corporations wherein minority stockholders may maintain suits when the corporate authorities are attempting to commit *ultra vires* acts to the detriment of the *cestuis que trust,* the stock holders, and then adds: "Why should a different rule apply to a municipal corporation? If the property or funds of such a corporation be illegally or wrongfully interfered with, or its powers be misused, ordinarily the action to prevent or redress the wrong should be brought by and in the name of the corporation. But if the officers of the corporation *are parties to the wrong, or if they will not discharge their duty,* why may not any inhabitant, and particularly any taxable inhabitant who will be injuriously affected, be allowed to maintain in behalf of all similarly situated a class suit to prevent or avoid the illegal or wrongful act? Such a right is especially necessary in the case of municipal and public corporations, and if it be denied to exist, they are liable to be plundered, and the taxpayers and property owners on whom the loss will eventually fall are without effectual remedy." (Our italics.) The text in 19 R. C. L., pages 1163-1164, is to the same effect.

In the case of Roberts v. City of Louisville, 92 Ky. 95, the direct question, on facts which we conceive to be in effect exactly parallel to those in this case, was presented. In that case the city proposed to convey certain wharf property theretofore held and controlled by it under certain legislative provisions to its sinking fund commission, which was a public arm of the city government, and certain taxpayers and citizens sought to enjoin the city from doing so upon the ground that it was violating the trust under which it acquired the property for the purposes mentioned and was an act in excess of its authority. The same question as to the right of plaintiffs to maintain that action was presented, and while the court in rejecting it adverted to the fact that under the allegations of the petition the plaintiff *might* suffer some peculiar injury different from other citizens if the contemplated transfer was made, yet the court went

further and, according to our construction of the opinion, sustained the right of plaintiffs to maintain the action upon the grounds, *supra,* set forth by Mr. Dillon, and in doing so said: "It is, says Dillon, the prevailing and almost universal doctrine in this country, that property-holders or taxable inhabitants have the right to resort to equity to restrain municipal corporations and their officers from transcending their lawful powers or violating their legal duties in any mode which will injuriously affect the taxpayers—such as making an unauthorized appropriation of the corporate funds, or an illegal or wrongful disposition of the corporate property, or levying and collecting void and illegal taxes and assessments. (Section 914) And, though the question of power to enjoin illegal and wrongful disposition of corporate property has not been, at the suit of taxpayers, directly presented to and decided by this court, the power of equity in such action to restrain the levying and collecting void and illegal taxes, which is founded on the same principles, has been distinctly recognized and sustained." See also Curran v. City of Louisville, 147 Ky. 592; Dyer v. Newport, 123 Ky. 203; Ramsey v. Shelbyville, 119 Ky. 180; Hilliard v. Fetter & Company, 127 Ky. 95; Stites v. Morton, 125 Ky. 672; Gathright v. Bylesby, 154 Ky. 122, and State Text Book Commission v. Weathers, 184 Ky. 748. The latter cases present analogous facts and the right of the citizen and taxpayer to maintain the action under circumstances similar to those appearing in this case was upheld, notwithstanding a failure on his part to show special and peculiar injury. Moreover, plaintiffs in this case pleaded, and it is admitted in the record, that in addition to being taxpayers in the city of Louisville they were also liberal subscribers to the $500,000.00 fund which was raised to supplement the $750,000.00 bond issue for the construction of the auditorium by the commission, and as such they had the right to insist that the commission would not surrender any of its control to any part of the auditorium, but which would be done if the contract in question was carried out according to its terms. We are, therefore, convinced that plaintiffs had the right to maintain the action and the court properly so held.

On the first question on the merits the learned chancellor wrote and filed an opinion which meets our approval, and upon which we do not feel we could improve. For that reason, as well as the further one that we are

crowded for time, we have concluded to adopt it, so far as applicable, as our own. Some portions of it deal with the right of plaintiff to maintain the action which we have hereinbefore discussed but which we have concluded to insert along with the other question disposed of. His opinion says: "This is a proceeding by certain inhabitants and taxpayers of the city of Louisville, suing for themselves and others similarly situated, to test the validity of a certain contract made June 19, 1925, between the Board of Park Commissioners of the city of Louisville and the Louisville Memorial Commission, who are made defendants.

"By the contract in question the Board of Park Commissioners (hereinafter referred to as the 'Park Board' or 'board') undertook to grant to the Louisville Memorial Commission (hereinafter referred to as the 'commission'), the right to erect and maintain a memorial auditorium in Central Park, a tract of about eighteen acres conveyed to the Park Board in the year 1904, 'in trust for public park purposes,' and since held by the board for such purposes, as is required by the charter of the board, which provides, among other thigs, that (sec. 2850, Ky. Stats. 1915): 'The title to all property acquired for park purposes shall vest in the board of park commissioners, and the same, with all the improvements and equipments, shall be held in strict and inviolable trust for public park purposes, free from all taxation, impost or assessment, state, county, district, municipal or otherwise.' The contract provided that the board should have 'complete custody, control and management' of certain portions of the basement of the new structure, to include a swimming pool, locker rooms, 'museum' and lavatories (these being designed to replace existing facilities of like character which must be removed to make way for the new building), while the remainder of the basement and all other portions of the new building should be under 'the complete custody, control and management' of the commission. And responsibility for the preservation of that portion of the building committed to the control of the commission and for the maintenance of order therein was, by the contract, placed upon the commission.

"An examination of the plans filed as exhibits shows that the ground to be occupied by the memorial building is about one-fifth of the entire area of Central Park and that of the ground so occupied about one-fourth or one-

third (or only the basement) will remain under the partial control of the board, while the remaining three-fourths or two-thirds of the ground area, as well as all of the building above the basement level, will pass, in perpetuity, under the exclusive ('complete') custody and control of the commission.

"Plaintiff say that the Park Board may not thus surrender the custody and control of its property to others, no matter what use is to be made of it, and that, even if the board were authorized thus to delegate its powers and duties to others, it certainly cannot do so for other than 'public park purposes,' which do not include the erection and maintenance of such a structure as is proposed, devoted to such uses as are intended.

"At the threshold we are met by defendants' denial of the right of plaintiffs to bring this suit. This denial is based upon the theory that, if the proposed use of a portion of Central Park is a proper 'park purpose,' as it must be assumed to be in considering the demurrer to the answer, then plaintiffs show no injury to themselves by the claimed unlawful delegation of power whether by the board or by the commision and that without injury they cannot have relief. If the erection and maintenance of such a building by the Park Board itself could not be objected to by plaintiffs, then what injury, ask defendants, can result to them from the single circumstance that this unobjectionable thing is to be done by the commission rather than by the board? This is a question that must be answered first of all.

"(1) It must be admitted, of course, that a petitioner to a court for relief must show some injury calling for relief. It is not a question, I take it, whether the injury is special or peculiar to the complainant or is felt alike by all inhabitants. It is a question whether or not there is any injury at all.

"I am of the opinion that the surrender by municipal officers of their powers and duties, to be exercised and performed by persons not authorized to do so, is such an injury to each taxable inhabitant of the municipality as gives him a right to complain. Dillon (Municipal Corporations) likens the right of citizens to enjoin abuses of power by public officers to the right of stockholders in a corporation to prevent the *ultra vires* acts of its officers, where the corporation itself declines to act, and to the right of *cestuis que trustent* to resist unauthorized acts of a trustee. If a trustee should under-

take to turn over the control and management of trust property to a stranger, I take it the *cestui que trust* would not have to be content with an assurance that the stranger would manage it as well as the trustee. The citizen, equally with the *cestui que trust* and the shareholder, has the right to demand more than that the affairs in which he is interested shall be well managed. He has the right to demand that they shall be managed by the persons lawfully selected to manage them.

"Roberts v. Louisville (92 Ky. 95), seems to me to support this conclusion. It is true that the opinion makes mention of the fact that complainants had a special interest, since they used the city wharves in the conduct of their business. But all citizens had the right to use the wharves on equal terms with every other citizen, and it is obvious the court did not refer to the special nature of complainants' business except by way of emphasis. It is true, the opinion refers to a danger that wharf dues would be raised or leases of wharves be made, if the transfer to the Commissioners of the Sinking Fund was consummated. But this was a matter of speculation and argument, the court saying that it was 'hard to see' why the conveyance was desired unless it was to increase the sinking fund revenue in some such manner.

"The threatened conveyance in the Roberts case was on condition that the Sinking Fund Commissioners should hold the property 'upon the same trusts and for the same purposes as it is now held by said city.' In the last analysis, the decision was that inhabitants, having the right to use the wharves on equal terms with all others, could enjoin public officers, holding property in trust, from delegating their power or disabling themselves from performing their duties. And that this was the true significance of the decision is pointed out in Curran v. City of Louisville (147 Ky. 592).

"Further support of the conclusion reached as to the right of taxable inhabitants to sue in such cases is found in the following decisions: Ramsey v. Shelbyville, 119 Ky. 180, and Hilliard v. Fetter L. & H. Co., 127 Ky. 95. While these cases are not as clear as the Roberts case, since it may be argued that in those cases complainants were threatened with a pecuniary injury, either through the levy of additional taxes or the loss to the city of income which would otherwise be derived from the public sale of a franchise, yet in both cases it is,

assumed that a taxpayer has the right to sue to prevent the *ultra vires* acts of public officers, upon the sole ground that they are *ultra vires*. In the Hillard case, there is nothing whatever to show, nor was it claimed, that there would be any pecuniary loss to the city from the consummation of the arrangement complained of, but merely that it was an arrangement which the Board of Public Works had no power to make., The case of State Text Book Commission v. Weathers (184 Ky. 748), although a mandamus case, seems to me to support cogently the right of the citizen to move for the protection of a purely public interest.

"(2)   Plaintiffs say that the right to rely upon the claimed lack of capacity in plaintiffs to sue has been waived by defendants because they have answered without making objection by special demurrer; and this is doubtless another reason for entertaining jurisdiction of the case.

"(3)   The claim that the Park Board has attempted, by the contract of June 19, 1925, to surrender to others powers and duties which the board alone is authorized to exercise and perform seems to me sound. An area of three acres or more is surrendered to the perpetual control of the commission. The reservation to the board of control over a part of the basement of the building to be erected on this ground is so slight a mitigation of the surrender as to be almost negligible. It still leaves the major portion of the ground area in the custody and control of the commission, and even that retained by the board is overtopped by the memorial building itself, which, being the exclusive property of the commission, will thus hang, like the coffin of the Prophet, suspended between heaven and earth. The property thus surrendered was purchased by the Park Board with bonds of the city of Louisville authorized for that purpose by a vote of the citizens of Louisville, 250 bonds of $1,000.00 each having been delivered by the city to the Park Board and by the board to the owners of Central Park who thereupon conveyed that property to the Park Board 'in trust for public park purposes.' The charter of the board requires that park property shall be 'held, managed and controlled' by the board, which term shall include 'all buildings, structures, improvements,' etc., 'and other things thereon.' The provisions of the charter (Ky. Stats., secs. 2840-2859), leave no doubt whatever of the intention of the legislature that all such

property should be in the exclusive custody and control of the board, to be held by it 'in strict and inviolable trust for public park purposes' (sec. 2850). The board is the body created by law to administer this trust. Its members are elected by popular vote and it is to the trustees thus selected by it that the public looks for the execution of the trust.

"To speak of the grant to the commission as a mere 'easement' or 'privilege' is to disregard realities, so far as the delegation of power is concerned. The commission received, in perpetuity, 'the complete custody, control and management' of the park property involved. In such case, the retention by the board of legal title to the land does not mitigate in the slightest degree its abdication of control. It could not make a more complete surrender of its power.

"That this is not allowable seems to me to be well established by the following cases: Roberts v. Louisville, 92 Ky. 95. This case has been commented upon in discussing the right of plaintiffs to sue. The point decided was that the control of property held for public purposes could not be transferred by the governmental agency, in whose charge it was placed by law, to another governmental agency, serving the same community, although the transfer be upon the same trusts. That control, said the court, involved 'duties and obligations to the public and individuals which cannot be ignored or shifted;' the repository of that control, 'which is by statute invested with power and burdened with the duty of maintaining, preserving and operating wharves, cannot either delegate the power or disable itself from performing the duties;' 'For the plain legal duty,' said the court, 'is imposed upon the general council to hold, control and manage the wharf property for use of the public, which cannot be evaded by transfer of it or otherwise.' City of Bowling Green v. Gaines, 123 Ky. 562. Here is was held that an attorney-at-law could not recover an agreed fee (or any fee) for services rendered the city, although both services and fee were fixed by contract made on behalf of the city by the city attorney in the exercise of authority so to contract conferred on the city attorney by ordinance of the city council. The opinion concedes that, if the council itself had made the contract, it would have been good and enforceable, but it held that the council could not delegate its power to another, saying: 'It is insisted that the case at bar does not come within the

principle' (that powers involving discretion and judgment cannot be delegated) 'for the reason that the maximum that the city attorney was to pay his assistant was fixed by the ordinance at 15 per cent. of the amount collected; but the rule is not that discretionary powers may be delegated with restrictions or partly delegated. The rule is that they cannot be delegated at all. . . . The council are elected by the people to have charge of the financial affairs of the city, and public policy does not permit the discretionary duties, which the law has placed upon them for the benefit of the public, to be delegated to others.' City of Louisville v. Parsons, 150 Ky. 420. Here the city council passed a joint resolution authorizing the mayor to appoint two 'commissioners' to make an examination of the affairs of the Louisville Water Company, the commissioners and the mayor being empowered to employ 'stenographic, clerical, engineering or other expert assistance.' The mayor and commissioners employed Parsons 'to report upon the condition of the water company from an engineering standpoint' and agreed to pay $1,171.00 for his service. The trial court gave Parsons judgment for that sum. In reversing the judgment and holding that Parsons could recover nothing the Court of Appeals finally put its decision upon the ground that legislation affecting the substantial rights of the city must be by ordinance and not by joint resolution; but in discussing the broader question of delegation of power, it said: 'The objection that the council was without power to delegate to the mayor and the commission authority to make the employments and incur the expenses provided for by the resolution, is in our opinion well taken. The council of the city is a body selected by the inhabitants to administer the affairs of the city. It is an agent of the city with delegated powers, and in the absence of statutory authority to surrender or commit some of its delegated power to other persons, it is without right to do so. It is of the greatest importance to the people of a city that the persons they have selected to manage its and their affairs should be charged with the full responsibility for their safe conduct and not be permitted to avoid or escape this duty by surrendering the functions conferred upon them to other persons. If municipal bodies, having the broad discretion and the large power they are clothed with, could by the creation of other agencies confer upon them the authority to administer in part the affairs of the city in the employ-

ment of yet other agents and in the expenditure of public funds, the people of the city would be deprived in a large measure of the personal qualifications the agents selected by them were supposed to possess and their municipal affairs be confided to the keeping of persons other than the ones selected by themselves.'

"It will no doubt be thought by many persons that an objection of this kind is highly technical and should not be permitted to stand in the way of an important, public advantage, such as defendants believe will result from the carrying out of this contract. But I am not at liberty to approve an unauthorized thing because a public advantage may be thought to flow from it. Counsel for defendants demand to know what difference it can make to plaintiffs or the public that the proposed use of park property be under the control of the commission rather than under the control of the Park Board, so long as the use itself is legitimate. But the same inquiry would have been equally pertinent in the cases reviewed above. In each of them the end aimed at was legitimate in itself but the method was not. That circumstance was held to be fatal in those cases and must, I think, be held to be fatal here.

"If an auditorium is to be erected and maintained upon park property, it must be under the control of the Park Board, since the board has been designated by law, and its members elected by popular choice, to manage and control that property. It cannot be said that, once the auditorium is built, the powers of maintenance and control no longer involve discretion. If an auditorium were built and controlled by the board no doubt the board would have the power, at any time in the future, to remove that structure if it should conclude that a better use could be made of the property. But under the contract of June 19, 1925, that power is abdicated. By the terms of the Memorial Commission Act, the building to be erected is to be 'permanent' and provision is made for securing funds, by taxation, for maintenance, improvement, 'replacement' and 'depreciation,' and a fund is required to be created for replacing the building 'in case of destruction of said memorial, or any portion thereof, by fire or wind or other casualty, or decay.' It is obvious, I think, that control of this property is forever lost to the Park Board, if this contract be carried out, except for a limited control of a portion of the basement.

It is true the contract says that the latter control shall be 'complete,' but it is obvious the board has lost all control as to the use to which that land shall be put, either now or at any future time.

"Much has been said as to the importance of cooperation between the different agencies of government. However desirable this may be, it must take place within the limitations imposed by law upon the liberty of action of those several agencies. Whether wisely or not, the legislature has confided the affairs of Louisville, not to a single agent clothed with all governmental powers, but to many agents, more or less independent one of the other. No doubt a certain inelasticity results from this multiplication of agencies and some public benefits may be lost which might flow from a more centralized control. But it must be assumed that there were counterbalancing advantages which controlled legislative action. Perhaps there is an element of safety in such a distribution of power.

"I conclude, therefore, that the Board of Park Commissioners was without power to make the contract of June 19, 1925. The demurrers of plaintiffs to the answers of the Park Board and the commission, and to each paragraph thereof, are therefore sustained."

Elaboration upon the points discussed in that opinion could not add to its force, nor to the convincing legal grounds upon which it is based. The Roberts and other cases cited as a foundation for it have firmly established the rule in this jurisdiction upon similar questions, and it is not for us at this late day to overturn it because, forsooth, it might be concluded that the patriotic purpose, in commemoration of which the auditorium was intended to be constructed, might be imperiled, as is insisted, if it could not be constructed under the contract in Central Park; nor is it the duty of courts to ignore a well established legal principle in order to meet a supposed emergency, howsoever pressing. We do not, however, share the apprehension of defendants that a nullification of the contract to construct the building in Central Park will result in its complete abandonment and a loss to the city of its use and convenience. "Necessity is the mother of invention," and it cannot be conceived that the patriotic citizens of Louisville will surrender the project unless the auditorium can be constructed at one particular spot. But however that may be, our duty is to construe and

administer the law as we see it, and our adherence to that rule compels the conclusion that the learned chancellor's opinion was correct, and it being decisive of the case it becomes unnecessary, we repeat, to advert to the other and last question, i. e., whether or not the building and its uses would be an appropriation of the park grounds or a portion thereof to other than park purposes.

Before closing the opinion, however, it might be stated that we do not share the suggestion of defendants and their learned counsel that the objections to the validity of the contract between the board and the commission is entirely fanciful and technical. Under that contract the board would have the right at any time after the auditorium was constructed to either repossess itself of the building and the grounds on which it stood, or it would not have that right, and which statement is uncontrovertably true. If it did not have the right to do so at any time in the future when it should conclude that the building and the operations carried on therein were interfering with the proper and appropriate uses of the park, then it would be deprived of removing that interference, because of its surrender of the right under the contract. If it does have the right, if it should conclude in the ligitimate exercise of its functions, and should repossess itself of the building followed by the further right to remove or replace it, then the inviolable trust funds of the commission would be dissipated and destroyed. So that, in either event the carrying out of the contract will bring about conditions which it was the evident purpose of the two statutes creating the board and the commission should never happen, and which evidence, to our minds, that there is involved in the litigated question more than a mere technicality.

Wherefore, for the reasons stated, the judgment is affirmed. Whole court sitting.