92  589
92  606

CASE 108—PETITION EQUITY—FEBRUARY 16.

# Miller, &c., v. Johnson, &c.

APPEAL FROM FRANKLIN CIRCUIT COURT.

1. WHERE A STATE CONSTITUTION HAS BEEN FORMED AND PROMUL-
GATED according to the forms of law and accepted and recognized as
valid by the political department of the Government, the courts will
not declare the instrument or any part of it invalid.   The question of
its validity is then not a judicial but a political one.   Therefore,
where a constitution after it has been submitted to and ratified by a
vote of the people is amended by the convention which framed it,
and the amended instrument is promulgated by the convention as the
constitution and acted upon by the people as the organic law of the
State, the courts will not inquire as to the power of the convention to
promulgate as the constitution an instrument different in some of its
parts from that which had been submitted to a vote of the people.

2. THE COURTS WILL DECLARE A MERE AMENDMENT TO A CONSTITUTION
INVALID if the method provided by the constitution for its amend-
ment has not been followed.

WALTER EVANS FOR APPELLANTS.

1. When the people accepted and approved the constitution submitted to
them under the Ordinance of April 11, 1891, the powers of the con-
vention were exhausted, and the document thereafter promulgated by
the convention, being a new and different one from that voted on by
the people, is void.   (Act May 3, 1890, 1 Sess. Acts, 1889–90, 124;
Cooley's Const. Limit., 31, 32 and 33; Jameson on Const. Conv., secs.
377, 409, 410, 411, 412 and 413; Wells v. Bain, 75 Pa. St., 39; Woods'
Appeal, 75 Pa. St., 59; State v. Tufly, 19 Nev., 391; Opinion of the
Judges, 6 Cush., 573; State v. The Mayor, 29 La. Ann., 863; Collier
v. Frierson, 24 Ala., 108; Sections 63 and 265 of the constitution
adopted by the people:)

2. Appellants as citizens and tax-payers have the right to resist in court
the attempted imposition upon them of a spurious constitution which
proposes to regulate and fix their rights and duties as citizens.   (Civil
Code, sec. 25; Ewing v. St. Louis, 5 Wall., 413; Brown v. Catletts-
burg, 11 Bush, 439; Gates v. Barrett, 79 Ky., 295; 2 High on In-
junctions, top page 869; Franz, Jr., v. Jacob, 88 Ky., 528; Allison
v. L., H. & C. R. Co., 9 Bush, 247; Citizens' Gas Co. v. Louisville
Gas Co., 81 Ky., 266; Carter v. Williamson, 11 Ky. Law Rep., 591.)

CHARLES G. RICHIE OF COUNSEL ON SAME SIDE.

Miller, &c.. v. Johnson, &c.

KNOTT & EDELEN for Johnson, appellee.

1. The Constitutional Convention had the power to promulgate the constitution without submission. The convention came into existence with its powers defined by article 12 of the Constitution of 1849–50, under which it was called, and the Legislature had no power to impose upon it any conditions or limitations other than those contained in that article. (Wells v. Bain, 75 Pa., 39; Woods' Appeal, *Idem*, 59; Opinion, 14 R. I., 649; State v. The Mayor, 29 La. Ann., 863; State v. Tufly, 19 Nev., 391; Koehler v. Hill, 60 Ia., 543; Collier v. Frierson, 24 Ala., 108; State v. Neal, 42 Mo., 119; Loomis v. Jackson, 6 W. Va., 708; Cooley, Con. Lim., *31; Debates of Const. Conv., 1849–50, p. 1053 *et seq;* Const. Journal, 1849–50, p. 444 *et seq;* Enc. Brit., Title United States, vol. 23, p. 773.)

Section 16 of article 8 of the Constitution of 1849–50 was added by the convention after it had submitted its work to a vote of the people, and that section was construed by this court as part of the existing constitution. (Varney v. Justice, 86 Ky., 596.)

2. It is not competent for the judicial department to denounce as invalid the organic law of the Government of which it is an integral and co-ordinate branch, especially where the other departments accept and act upon it as valid. (Luther v. Borden, 7 How., 30.)

3. The allegations of the petition do not make a case for injunction against this appellee, even on the assumption that the constitution promulgated on the 28th of September, 1891, is invalid. (Gen. Stats., chap. 98, sec. 9; People v. Bissell, 68 Am. Dec., 591; Bondurant v. Apperson, 4 Met., 30; Hanson v. Bowyer, *Idem*, 109.)

W. J. HENDRICK, Attorney General, and R. REID ROGERS for appellees:

No brief in record.

CHIEF JUSTICE HOLT delivered the opinion of the court.

The question presented is a grave and exceedingly important one. It reaches to the very foundation of constitutional government. Little aid in arriving at a correct solution of it is furnished by precedent. Little, if indeed any, authority of direct bearing can be found.

Under the provisions of the Constitution of 1849, steps were taken to form a new one. We must assume, in view of what has taken place, that they were legal. As the result the Legislature passed the Act of May 3, 1890,

providing for the calling of a convention for such purpose, and the election of delegates.

It provided that before any form of constitution made by them should become operative, it should be submitted to the voters of the State, and ratified by a majority of those voting. The Constitution then in force authorized the Legislature, the preliminary steps having been taken, to call a convention for "the purpose of re-adopting, amending or changing" it, but contains no provision giving the Legislature the power to require a submission of its work to a vote of the people.

The convention met in September, 1890, and having in April, 1891, completed a draft of a constitution, it, by ordinance, submitted it to a popular vote, and then adjourned until September following. During the recess the work was approved by a majority of nearly one hundred and forty thousand, the total vote cast being two hundred and eighty-eight thousand, three hundred and sixty. When the convention re-assembled, the delegates, moved no doubt by patriotic impulse, made numerous changes in the instrument, some of which are claimed to be material, while others were but a change of language or the correction of grammatical errors; and as thus amended it was promulgated by the convention on September 28, 1891, as the Constitution of the State.

The appellants, who are voters and taxpayers, suing for themselves and *per* an order of court for all others united with them in interest, as provided by our Code of Practice, shortly thereafter brought this action against the Public Printer and the Secretary of State, to enjoin the one from printing, at the public expense, the instrument so promulgated; and the other from preserving it

in the State archives as the Constitution of the State; and also asking that it be adjudged not to be such, but spurious and invalid. This is asked upon the ground that the instrument promulgated by the convention is not the one adopted by the vote of the people, owing to the changes subsequently made in it.

It is urged upon the part of the appellees, that the appellants' suit is based upon a speculative idea of injury; and that no such special, particular and substantial damage is impending to them as to authorize it. Also that the action does not lie against the appellees because the printing or preservation of the instrument will not add to or detract from its validity. We waive the consideration of these objections, because even if entitled to it, the importance of this controversy to the State requires a decision upon the merits.

It is conceded by all that the people are the source of all governmental power; and as the stream can not rise above its source, so there is no power above them. Sovereignty resides with them, and they are the supreme law-making power. Indeed, it has been declared in each of the several constitutions of this State, that "all power is inherent in the people," and this is true from the very nature of our government. It is contended by some, however, that inasmuch as the then existing constitution provided for the calling of a convention by the Legislature, without giving the latter the power to direct a submission to a vote of the people of the proposed new one, and gave the power to the convention to make one, that therefore it was not necessary, to its validity, to submit it to a popular vote, and that in attempting to require this, the Legislature exceeded its power. In other words, that

the convention had plenary power in the matter, not because of ultimate sovereignty, but because the constitution gave it; that it submitted its work to the people merely to know if it pleased them; and that the Legislature could no more control them in this matter than it could in the framing of the instrument.   Others contend that a ratification by a popular vote is necessary in all cases; that the attempted limitation upon the power of the convention by the Legislature was valid; and even if not, yet as delegates were elected under the statute, and with the understanding probably, upon the part of the people, that they were to pass upon the work; and as the convention actually submitted it to them, that the determination by the principal was final, and terminated the power of the agent.   Each of these various views is supported by more or less authority, but we need not determine which of them is in our opinion correct, because another question properly in advance presents itself.

If a set of men, not selected by the people according to the forms of law, were to formulate an instrument and declare it the constitution, it would undoubtedly be the duty of the courts to declare its work a nullity.   This would be revolution, and this the courts of the existing government must resist until they are overturned by power and a new government established.

The convention, however, was the offspring of law. The instrument which we are asked to declare invalid as a constitution, has been made and promulgated according to the forms of law.   It is a matter of current history, that both the executive and legislative branches of the government have recognized its validity as a constitution, and are now daily doing so.   Is this question, there-

fore, one of a judicial character? Does its determination
fall within the organic power of a court? It is our un-
doubted duty, if a statute be unconstitutional, to so de-
clare it. Also, if a provision of the State Constitution
be in conflict with the Federal Constitution, to hold the
former invalid; but this is a very different case.

It may be said, however, that for every violation of, or
non-compliance with, the law there should be a remedy
in the courts. This is not, however, always the case.
For instance, the power of a court as to the acts of other
departments of the government is not an absolute one,
but merely to determine whether they have kept within
constitutional limits. It is a duty rather than a power.
The judiciary can not compel a co-equal department to
perform a duty. It is responsible to the people; but if
it does act, then when the question is properly presented,
it is the duty of the court to say whether it has con-
formed to the organic law. While the judiciary should
protect the rights of the people with great care and
jealousy, because this is its duty, and also because in
times of great popular excitement, it is usually their last
resort, yet it should at the same time be careful not to
overstep the proper bounds of its power as being perhaps
equally dangerous; and especially where such momentous
results might follow, as would be likely in this instance,
if the power of the judiciary permitted, and its duty re-
quired, the overthrow of the work of the convention.

After the American Revolution, the State of Rhode
Island retained its colonial charter as its constitution, and
no law existed providing for the making of a new one.
In 1841 public meetings were held resulting in the elec-
tion of a convention to form a new one, it to be submit-

ted to a popular vote. The convention framed one, sub-
mitted it to a vote and declared it adopted. Elections
were held for State officers, who proceeded to organize a
new government. The charter government did not ac-
quiesce in these proceedings, and finally declared the
State under martial law. It called another convention,
which, in 1843, formed a new constitution. Whether the
charter government, or the one established by the volun-
tary convention, was the legitimate one, was uniformly
held by the courts of the State not to be a judicial, but a
political question; and the political department having
recognized the one, it was held to be the duty of the
judiciary to follow its decision.

The Supreme Court of the United States, in Luther v.
Borden, 7 Howard, page 1, while not expressly deciding
the principle, as it held the Federal Court was bound by
the decision of the State court, yet in the argument ap-
proves it, and in substance says, that where the political
department has decided such a matter the judiciary
should abide by it.

Let us illustrate the difficulty of a court deciding the
question. Suppose this court were to hold that the con-
vention when it re-assembled had no power to make any
material amendment, and that such as were made are
void by reason of the people having theretofore approved
the instrument. Then next this court must determine
what amendments were material, and we find the court
in effect making a constitution. This would be arrogat-
ing sovereignty to itself. Perhaps the members of the
court might differ as to what amendments are material,
and the result would be confusion and anarchy. One
judge might say that all the amendments, material and

immaterial, were void. Another that the convention had the implied power to correct palpable errors, and then the court might differ as to what amendments are material. If the instrument, as ratified by the people, could not be corrected or altered at all, or if the court must determine what changes were material, then the instrument as passed upon by the people, or as fixed by the court, would be lacking a promulgation by the convention, and if this be essential, then the question would arise: What constitution are we now living under, and what is the organic law of the State? A suggestion of these matters shows what endless confusion and harm to the State might, and likely would, arise.

If through error of opinion the convention exceeded its power, and the people are dissatisfied, they have ample remedy, without the judiciary being asked to overstep the proper limits of its power. The instrument provides for amendment and change. If a wrong has been done, it can and the proper way in which it should be remedied, is by the people acting as a body politic. It is not a question whether merely an amendment to a constitution, made without calling a convention, has been adopted as required by that constitution. If it provides how it is to be done then, unless the manner be followed, the judiciary, as the interpreter of that constitution, will declare the amendment invalid. (Koehler v. Hill, 60 Iowa, 543; State v. Tufly, 19 Nev., 391.)

But it is a case where a new constitution has been formed and promulgated according to the forms of law. Great interests have already arisen under it; important rights exist by virtue of it; persons have been convicted of the highest crimes known to the law according to its

provisions; the political power of the government has in many ways recognized it, and under such circumstances it is our duty to treat and regard it as a valid constitution and now the organic law of our Commonwealth.

We need not consider the validity of the amendments made after the convention re-assembled. If the making of them was in excess of its power, yet as the entire instrument has been recognized as valid in the manner suggested, it would be equally an abuse of power by the judiciary, and violation of the rights of the people, who can and properly should remedy the matter, if not to their liking, if it were to declare the instrument or a portion invalid, and bring confusion and anarchy upon the State.

The judgment of the lower court dismissing the action is affirmed.

JUDGE BENNETT DELIVERED THE FOLLOWING SEPARATE OPINION.

The question made in this case is: Could the convention that promulgated the present constitution, on the occasion of its re-assembling in last September, make material amendments to, or change the constitution that the people, by their votes, adopted in August preceding? The importance of that question justifies me in writing this separate opinion upon that subject; not that according to the opinion of this court it is absolutely essential, but as the assumption and exercise of the power by the convention, which might have been exercised by twenty-nine members of that honorable body—that number only being a majority of a quorum consequently could effect the changes—is so heavily laden with mischief to the inherent and inalienable rights of the people, and is so

completely the exercise of arbitrary power that overrides and defies the voice of the people, that I do not wish my silence to be construed, now or hereafter, as a consent to that startling proposition; but I wish now to enter upon record, there to remain as long as republican government shall last, my solemn protest against the assumption of such power, which, carried to its legitimate results, reflects back the harsh grating of the dungeon door, and the rattle of the tyrant's chains.

Did the convention, upon its re-assembling, have the extraordinary power to materially change or abrogate *in toto* the constitution, which the people, just a few weeks before, had adopted as their fundamental law, by a majority of one hundred and thirty-eight thousand votes, and declare their own production to be the fundamental law of the State for the government of their masters? I say the convention had no such power, and only a few suggestions will suffice to show the truth of my assertion.

The 4th section of the Bill of Rights, found in the constitution of 1849–50, is the keystone of all republics. It is: "That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, happiness, security and protection of property. For the advancement of these ends they have the inalienable and indefeasible right to alter, reform or abolish their government as they may think proper."

As said, the people that adopted the constitution of 1849–50, declared that all power was inherent in them, and that the constitution then made for their peace, safety, happiness, security and protection of property, was founded on their authority; that for the advancement of

these ends they had the inalienable and indefeasible right to alter, reform or abolish their government in such manner as they thought proper.

It has never been doubted, and it is certainly true, that republican government is founded upon the direct authority of the people, and that they alone have the right to alter, reform or abolish it in such manner as they may prescribe. It is these fundamental principles that distinguish republican governments from arbitrary or monarchal power. It is also true that this inherent power in the people means sovereign power, which they may exercise in any manner prescribed by themselves. They may prescribe that the alteration, reformation or abolition of their government, and a new one established in its stead, may be effected by their agents having absolute authority from them. In such case, the authority would be that of an agency, with unrestricted or unlimited powers. Such authority the people may give to their delegates as agents, the same as a private individual may confer upon his agent unlimited authority; or the people may effect these changes by conferring upon their agents—the delegates—a limited authority to formulate changes in their fundamental law, and submit those changes to them for their ratification or rejection. It seems to me that the people can not be denied this right, upon natural grounds, apart from the constitutional provision quoted, except by their consent expressly given in language that admits of no doubt; there must be no uncertain sound about it; and if the language is susceptible of construction, it must be construed in favor of the inalienable and inherent right of the people to found their free government by their

own voices, and not by an unlimited and uncontrollable
agency.

It is conceded by the distinguished gentleman, ex-Gov-
ernor J. Proctor Knott, in his argument before the court,
in behalf of the appellees, and his position in his printed
brief means substantially the same thing, that these propo-
sitions are fundamental. He said, if I caught him cor-
rectly—and I paid marked attention to his speech—in
answer to the question, Were the people or the dele-
gates sovereign? The people were sovereign, of course.
*Question*—Were the delegates the agents of the people?
*Answer*—They were. *Question*—Had not the people the
right to limit the authority of their agents and to reserve
to themselves the right to approve of or to reject the act of
their agents, and to make their action in reference thereto,
final? · *Answer*—Yes, the people would have had that
authority, except for the fact that they surrendered it by
the 12th article of the constitution of 1849–50, and con-
ferred absolute authority upon their delegates to change
that constitution, and denied to themselves the right to
approve or reject the same, except as a mere matter of
grace; and that the 10th section of the Act of May 3,
1890, authorizing the selection of delegates to the conven-
tion, which section provides that, "before any constitution
agreed upon by said convention shall take effect or be-
come operative, the same shall be submitted to the qual-
ified voters of the Commonwealth, and ratified by a
majority of those voting," was unconstitutional and void.
In other words, the people, by the 12th article of the
constitution of 1849–50, retained only so much of their
inherent and inalienable right to alter, reform or abolish
their government, as consisted in electing delegates, and

that the all-important part of changing that instrument, upon which their peace, happiness, security and right of property depended, they delegated absolutely to their agents, putting it wholly beyond their control.

The language of said section, after providing for the selection of delegates and after they have been elected, makes it the duty of the delegates "to meet within three months after their election for the purpose of re-adopting, amending or changing this constitution." As said, it is contended that this language gives the delegates plenary power to bind the people, hands and feet, and any effort of theirs to restrict the arbitrary power, and secure to themselves the right to approve or reject the work of their agents, is unconstitutional and void. Now, it seems to me to be clear that the language quoted is not a grant of additional power to the delegates; they possessed, by implication, that power. Why, then, was the language inserted? The answer is, that the people, always vigilant in the protection of their rights, and being unwilling to leave that which affected their inherent rights to the construction of delegates reasoning logically from different analogies existing in the minds of each delegate, or from selfish motives, used language that clearly limited the power of the delegates to the duty of re-affirming, amending or changing the constitution. They are told that they should have in view—it should be their aim (the expression "for the purpose" means just that thing)—the re-adopting, amending or changing the constitution. That was to be the business in hand, and none other. The language quoted does not say that the people surrendered their right to adopt or reject the work of the convention; such conclusion is the result of construction,

far fetched, in my opinion. Then the question arises, is the inherent and indefeasible right of the people to make, amend or change their government to be taken away from them by construction; or is it to be established by a process of reasoning that the people surrendered that right to their agents to be exercised in a plenary and arbitrary manner? If that be so, what security have the people against any usurpation that may be sustained to the satisfaction of the usurper by ingenious and subtle reasoning?

Now to guard against calamity of that kind, is it not the best to adhere to the proposition so clearly expressed in the language *supra*, that the right of the people to make, amend or change their government is inherent and inalienable, which can not be taken away from them, nor which they can not surrender or delegate to others, except by language unequivocally expressing that intention? There is no language to be found in the constitution expressing that intention. It is admitted by all that the constitution is silent upon that subject.

The opinion of the court in this case, in substance, says that the constitution is silent upon that subject. The language is: " But contains no provision giving the Legislature the power to require a submission of its work to the people." The fact that the instrument is silent upon that subject means that the people did not surrender their right. It is upon the principle that the right of the people is inherent, inalienable and indestructible, except as they may surrender that right in forming their government, that when the constitution is silent upon any subject, their right has not been surrendered, and the power of the Legislature is supreme in reference

thereto. And, as said, the question as to whether or not that right has been surrendered, should not be made to depend upon construction or uncertain sound; but it should be expressed in unequivocal terms. By the silence of the constitution, the right of the people to require the submission was not surrendered, but was reserved by them as their inherent and inalienable right, which they could exercise directly by approving or rejecting the instrument; or by conferring that right upon their delegates, as agents. That construction does not impair, by implication, the rights of the people; but their rights are left as they declared them—inherent and inalienable. If we do not declare the language quoted to mean as I have indicated, but give it the construction contended for by the distinguished counsel for the appellees, we deprive the people of all legal right to alter or amend their government. Such a construction is forced, and saps the foundation of republican government. There is no genius known to me that has convinced me that a power of that sort has been given by the people. When I find the genius that can make plain and satisfactory to me the distinction between the expressions, "tweedledum" and "tweedledee," or "come out McCarty" and "McCarty come out," or "divide a hair 'twixt south and south-west side," that genius may possibly convince me of the truth of the proposition contended for.

As said, section 4 of the Bill of Rights is the foundation of the supreme power of the people and the Legislature over any subject about which their organic law is silent. And the constitution being silent upon the subject of submission, the power of the Legislature, as the people's agents, is supreme upon that subject; and they

had a perfect right to provide, as they did, that the convention must submit their work to the people for ratification or rejection; or they might have provided that they should have the absolute power upon that subject. They could do this, as said, because their power was supreme upon that subject. But it is said that the convention of 1849–50, after submitting their work to the people, made material amendments to that constitution as ratified by the people. That is true; but the convention of 1849–50 had that power, because their agency was unlimited; the people did not restrict them in their agency. But the delegates to the convention of 1890–91 were expressly limited in their authority; the people refused to give them absolute power, but reserved to themselves the right to approve or reject the work of their agents, which they, however, disregarded. It follows from what I have said, that all material changes made by the convention after it re-assembled in September are void.

But it may be true, and I believe it is true, that if the people, through their accredited agents, adopt the constitution, amendments and all, and administer the government under it, that is an end of our authority. It is certainly true, that if the people hold elections under the instrument and government is administered under it, they thereby ratify it. I do not mean to say that the convention, upon re-assembling, might not have corrected mere verbal inaccuracies that did not change the substance of the instrument. For instance, where a promissory note reads, I promises to pay, there is no doubt that the payee may erase the letter *s*, so as to make it grammatical, without being guilty of materially changing the instrument, and thereby releasing the obligor. But it is said the

delegates told the people, in discussing the question, that they would have the right to change the constitution if they adopted it; but the record is silent upon that subject. However, if outside matter may be indulged in, the people were told just as often, and by just as good lawyers and statesmen, that the convention, upon re-assembling, would have no such power, and as such statements were consonant with reason and the rights of the people, I presume that they voted for the constitution, appreciating the fact that a mere majority of a quorum of the convention could not and would not dare attempt to outrage them in that manner.

Now it is not the merit of the amendments that I object to, because they seem to me to be wise and proper; but it is the exercise of a dangerous and arbitrary power that I object to. Nor do I mean to reflect upon the honor and patriotism of the gentlemen that advocated the right to make the amendments. I know that some of them, and I believe all of them, are patriots, and honestly believed they had the power; but I do mean to say that, in my humble opinion, they labored under a grave misapprehension.