## Wise et al. v. Chandler et al.

(Decided Oct. 1, 1937.)

LAFON ALLEN and OLDHAM CLARKE for appellants.

B. M. VINCENT, Attorney General, and J. W. JONES, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

This is an appeal from a judgment of the Franklin circuit court dismissing appellants' petition as amended on the ground of its alleged failure to state facts sufficient to constitute a cause of action. The suit was filed for the purpose of enjoining the Governor and other defendants from certifying to the Secretary of State of the United States, the Presiding Officer of the United States Senate, and the Speaker of the House of Representatives, copies of a resolution adopted at the Extraordinary Session of the General Assembly on January 13, 1937 (Acts Fourth Special Session 1936-37, c. 30), purporting to ratify the so-called Child Labor Amendment to the Constitution of the United States on behalf of the State of Kentucky. In addition to the injunctive and general relief prayed, appellants asked for a declaration of rights concerning the validity of the resolution of the General Assembly and of the status of the Amendment.

The petition was filed in the Franklin circuit court about 8 o'clock a. m. on January 15, 1937, bond was executed, and a restraining order was issued immediately against the defendants enjoining each of them from sending copies of the resolution to the Secretary of State, Presiding Officer of the Senate, or Speaker of the House. On the same day, but before he was actually served with a copy of the restraining order or summons in the suit, the Governor forwarded a certified copy of the resolution to the Secretary of State. It is not claimed that he knew of the pendency of this proceeding at the time of such action.

On the following day (January 16, 1937) appellants filed an amended petition in which they set out the action taken by the Governor since the filing of the suit, and

**4**

they asked for a mandatory injunction to require him. to notify the Secretary of State of the pendency of this proceeding and that the notification then in the hands of the post office for delivery to the Secretary of State was void and should be disregarded. No action was taken on this amended petition. Appellees, without questioning the right or capacity of appellants to bring the suit, filed a general demurrer to the petition as amended. The demurrer was sustained, and appellants declined to plead further. Their petition was dismissed, and this appeal followed.

On June 2, 1924, the Sixty-Eighth Congress of the United States proposed the so-called Child Labor Amendment to the several States (see 43 Stat. 670). We are not here concerned with the merits or demerits of the Amendment, but simply with the mechanical process of amending the Federal Constitution under Article V of that instrument providing, so far as pertinent to this case:

"The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments. to this Constitution, * * * which * * * shall be valid to all intents and purposes as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress."

During the year following the submission of the Amendment, in 1924, it was ratified by one State and rejected by three. In 1925 it was ratified by three additional States and rejected by an additional thirty-two. In 1926 the General Assembly of Kentucky adopted a resolution rejecting the Amendment (Senate Resolution No. 12, Acts 1926, c. 345), and its action was certified to the Secretary of State of the United States some six or seven months thereafter. One other State likewise rejected the Amendment that year. In 1927 Montana ratified the Amendment (House Joint Resolution No. 2, Laws Mont. 1927, p. 588), although it had previously, in 1925, rejected it, and Maryland rejected it for the first time. No action at all was taken by any State, either one way or the other, during 1928, 1929, and 1930. In 1931 Colorado, after a previous rejection, ratified it (House Concurrent Resolution No. 9, Laws Colo. 1931, p. 827). Again no action was taken in 1932, but in 1933 there was.

a general revival of interest in the question, and action either ratifying or rejecting it was taken in twenty-three States. Action was likewise taken in various States in each succeeding year thereafter. If a State which has once acted on an amendment to the Federal Constitution may act again and change its position thereon, then there were twenty-eight ratifications and twenty rejections standing at the date of the commencement of this action.

On December 23, 1936, the Governor of Kentucky issued a proclamation convening the General Assembly in Extraordinary Session for the purpose of considering certain enumerated subjects (Constitution of Kentucky, sec. 80) not including the proposed Amendment. On January 8, 1937, the Governor amended his call to include consideration of the Amendment, and the General Assembly thereupon adopted the resolution purporting to ratify the Amendment on behalf of the Commonwealth of Kentucky.

It is urged by appellants:

*First.* That the power reserved to the States by Article V of the Federal Constitution, to pass upon a proposal by Congress for an amendment of that instrument, when once affirmatively exercised, is exhausted and that the Kentucky Legislature, having exhausted that power on March 24, 1926, by the adoption of a concurrent resolution of both Houses, affirmatively rejecting the Amendment in question, and having caused its action to be certified by the Governor of Kentucky to the Secretary of State of the United States, to the Presiding Officer of the United States Senate, and to the Speaker of the House of Representatives of the United States, had exhausted the power invoked by the congressional proposal.

*Second.* That, including the rejection by the Kentucky Legislature on March 24, 1926, the Amendment had then been affirmatively rejected by twenty-six States, in each instance by resolution of both houses of the Legislature, that in twenty-one of those States the resolution has been duly certified to the Secretary of State of the United States, and that the affirmative rejection of the Amendment by more than one-fourth of the States of the Union constituted a final and irrevocable decision of the referendum to the state Legislatures of the congressional proposal.

*Third.* That, in order to validate a proposed amendment as part of the Federal Constitution, ratification by three-fourths of the States must take place within such a reasonable time after its proposal as would make their action an expression of the approval of the people, sufficiently contemporaneous in that number of States to reflect the popular will in all sections of the country at relatively the same period (Dillon v. Gloss, 256 U. S. 368, 41 S. Ct. 510, 65 L. Ed. 994); that twelve years and seven months, which was the time that elapsed between the proposal of the Amendment by Congress on June 2, 1924, and the attempted ratification thereof by the Kentucky Legislature on January 13, 1937, was not such a reasonable time; that at that time the congressional proposal, if not conclusively defeated by the adverse action theretofore taken by the States, must, at least, be regarded as abandoned, and that consequently said attempted ratification was of no effect.

*Fourth.* That the session of the Kentucky Legislature at which the resolution of purported ratification was adopted was a special session, and action upon the proposed Amendment was not one of the subjects mentioned in the Governor's proclamation convening that session.

It seems logically to follow from the provision in Article V of the Federal Constitution that the framers of that instrument contemplated that the effect of ratification or rejection by the States would be the same whether taken by the Legislatures of the several States or by conventions held therein. "If an amendment to the Federal Constitution should be proposed by Congress, and submitted to State Conventions instead of the legislatures, the powers and disabilities of the two classes of bodies in respect to the amendment would, it is conceived, be precisely the same." Jameson, Treatise on Constitutional Conventions, (4th Ed.) sec. 586. In Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 497, 64 L. Ed. 871, 10 A. L. R. 1504, a case involving the adoption of the Eighteenth Amendment, the court said:

> "The proposed change can only become effective by the ratification of the Legislatures of three-fourths of the states, or by conventions in a like number of states. The method of ratification is left to the choice of Congress. Both methods of ratification, by Legislatures or conventions, call for ac-

tion by deliberative assemblages representative of the people, which it was assumed would voice the will of the people."

It was conceded in argument of this case at the bar that the proposal by Congress of an amendment to the Federal Constitution was analogous to the making of an offer for acceptance or rejection under the law of contracts. It is unnecessary to speculate, with Webster, Clay, or Calhoun, as to whether or not the Constitution is itself a fundamental charter of government or a compact between sovereign states. It is sufficient for our purposes to concede that there is an analogy to the principles of contract law in the processes of amending the Federal Constitution.

So far as we have been able to discover, no writer on the subject has undertaken to defend the position that the delegates to a state convention, elected and assembled for the single purpose of acting upon a proposed amendment to the Federal Constitution, could reject the proposed amendment and thereafter, having adjourned sine die, reassemble and adopt a resolution of ratification. Even if it be conceded that a State might reject an amendment and later, while the amendment is still before the people, change its position thereon, certainly this power could not logically be said to exist after an amendment has been rejected by more than one-fourth of the States and these rejections duly certified to the Secretary of State of the United States.

In Dillon v. Gloss, 256 U. S. 368, 41 S. Ct. 510, 512, 65 L. Ed. 994, the court, in speaking of Article V, said:

"We do not find anything in the Article which suggests that an amendment once proposed is to be open to ratification for all time, or that ratification in some of the states may be separated from that in others by many years and yet be effective. We do find that which strongly suggests the contrary. First, proposal and ratification are not treated as unrelated acts, but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time. Secondly, it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently. Thirdly, as ratification is but the expression of the

approbation of the people and is to be effective when had in three-fourths of the states, there is a fair implication that it must be sufficiently contemporaneous in that number of states to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do. These considerations and the general purport and spirit of the Article lead to the conclusion expressed by Judge Jameson 'that an alteration of the Constitution proposed to-day has relation to the sentiment and the felt needs of to-day, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.' That this is the better conclusion becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago— two in 1789, one in 1810 and one in 1861—are still pending and in a situation where their ratification in some of the states many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more states to make three-fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and in our opinion it is quite untenable. We conclude that the fair inference or implication from Article V is that the ratification must be within some reasonable time after the proposal.''

The functional identity of state Legislatures and state conventions is further indicated in the opinion in Hawke v. Smith, supra, where Mr. Justice Day, speaking for the court, said:

"Ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the state to a proposed amendment."

We can find no logical point of difference in the ultimate result whether Congress chooses the one or the other mode of sounding the sentiment of the people in regard to a proposed amendment.

It is the prevailing, though not unanimous, view of writers on the question that a resolution of ratification

of an amendment to the Federal Constitution, whether adopted by the Legislature or a convention, is irrevocable. This conclusion seems inescapable as to the action of a convention called for the purpose of acting upon an amendment. When it has acted and adjourned, its power is exhausted. Since the "powers and disabilities" of the two classes of representative assemblies mentioned in Article V are "precisely the same," when a Legislature, sitting, not as a lawmaking body, but as such an assembly, has acted upon a proposal for an amendment, it likewise has exhausted its power in this connection.

Logically, this view would accord finality to whatever action was taken, whether by convention or through the Legislature. A contrary doctrine, however, to the effect that, while an act of ratification is final and irrevocable, an act of rejection is no obstacle to a subsequent ratification, has made its appearance in academic discussions of the subject. The theory was first advanced during the controversy which attended the adoption of the Civil War Amendments. Those Amendments were proposed during the period of reconstruction, and the question of the standing of the seceded States came under consideration. As early as July, 1861, the Congress had formally declared that, upon the part of the government, the war was being waged "to preserve the Union, with all the dignity, equality and rights of the several States unimpaired." But, when that purpose seemed to have been accomplished through victorious armies, men in positions of power and influence took the singular position that the result of the war for the preservation of the Union was the destruction of the Union, and that consequently the seceding States were to be treated as conquered provinces. The governments which had been set up in the Southern States following the Amnesty Proclamation by President Lincoln (13 Stat. 730) were declared illegal, and the territory was divided into "military districts," each of which was put under the superintendence and control of a major general.

The First and Second Reconstruction Acts were passed in March, 1867 (14 Stat. 528, 15 Stat. 2), over the vetoes of President Johnson. The first of these Acts recited that "no legal State governments or adequate protection for life or property now exist in the

rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas, and Arkansas,'' thus setting aside the governments which had been organized under Lincoln's Amnesty Proclamation. The Thirteenth Amendment, which was proposed February 1, 1865, had been ratified by many of those governments, to wit: Virginia, Louisiana, Tennessee, Arkansas, South Carolina, Alabama, North Carolina, and Georgia. The Fourteenth Amendment, proposed June 16, 1866, was rejected by four of the Southern States in 1866 and by Virginia in 1867, all acting through legislatures which were parts of the governments set up under, the Amnesty Proclamation. Thereafter, these governments were declared by Congress to have been illegal, and the adoption of the Fourteenth Amendment was accomplished by ratification by the ''carpet bag'' governments of Georgia, North Carolina, and South Carolina, in July, 1868.

The adoption of the Thirteenth Amendment was almost a matter of course following the victory of the Union armies. New Jersey at first rejected this Amendment, but subsequently ratified it. However, its attempt at ratification occurred subsequent to the time when the Amendment had been adopted by three-fourths of the States, and it was not mentioned as one of the ratifying States in the proclamation.

As to the Fourteenth Amendment, at the time of Mr. Seward's first proclamation of its adoption, dated July 20, 1868 (15 Stat. 706), there were thirty-seven States in the Union, and the assent of twenty-eight States was required to make the Amendment a part of the Constitution. Twenty-five States ratified and made no attempt to reverse their position. Two states—Ohio and New Jersey—ratified and subsequently undertook to reject the Amendment. North Carolina and South Carolina ratified through their military governments after having rejected the Amendment through their ''Amnesty Proclamation'' governments. There were, therefore, twenty-nine ratifications, or one more than the number required for adoption of the Amendment. Secretary Seward, however, in his first proclamation, pointed out not only that New Jersey and Ohio had attempted to withdraw their ratifications, but also that in six Southern States (Arkansas, Florida, North Carolina, Louisiana, South Carolina, and Alabama) the resolution of ratification had been adopted ''by newly con-

stituted and newly established bodies avowing themselves to be, and acting as the legislatures respectively of," those States. He said that it was "deemed a matter of doubt and uncertainty" whether the later resolutions of Ohio and New Jersey were "not irregular, invalid and therefore ineffectual for withdrawing the consent of the said two States." His proclamation then continued thus:

"And whereas the twenty-three States first hereinbefore named, whose legislatures have ratified the said proposed amendment, and the six States next thereafter named, as having ratified the said proposed amendment by newly constituted and established legislative bodies, together constitute three fourths of the whole number of States in the United States:

"Now, therefore, be it known that I, William H. Seward, Secretary of State of the United States, by virtue and in pursuance of the second section of the act of Congress approved the twentieth of April, eighteen hundred and eighteen, hereinbefore cited, do hereby certify that if the resolutions of the legislatures of Ohio and New Jersey ratifying the aforesaid amendment are to be deemed as remaining of full force and effect, notwithstanding the subsequent resolutions of the legislatures of those States, which purport to withdraw the consent of said States from such ratification, then the aforesaid amendment has been ratified in the manner hereinbefore mentioned, and has become valid, to all intents and purposes, as a part of the Constitution of the United States."

This proclamation was made on July 20, 1868. Upon its being submitted to the Congress, that body, on the following day, July 21, 1868 (15 Stat. 708, 710), adopted a resolution which, after reciting that the twenty-nine States mentioned above had ratified the Amendment, affirmed "that said Fourteenth Article is hereby declared to be a part of the Constitution of the United States and it shall be duly promulgated as such by the Secretary of State." It happened that on that very day Georgia had withdrawn her former rejection of the Amendment and had ratified it and, although this State was not mentioned in the congressional resolution, it was included in Secretary Seward's second proclamation of July 28, 1868 (15 Stat. 708). Thus, at the time of the second proclamation, there were ratifications by

thirty States, if the congressional method of counting the vote was correct. That method was to resolve all doubts in favor of ratification. States that had ratified and then rejected and States that had rejected and then ratified were all counted as ratifying.

The ratifications of New Jersey and Ohio were not essential to the adoption of the Amendment, provided the votes of the two Carolinas and of Georgia could be counted on that side. But, even with Georgia in the fold, it was still necessary to have either New Jersey or Ohio or one of the Carolinas. Congress, and Secretary Seward under its instructions, took them all and thus had two more than the required three-fourths.

It was in this tense atmosphere of reconstruction that Judge Jameson wrote his book, and it was from this nonjudicial precedent that he drew the surprising conclusion that consent to an amendment once given, no matter how hastily and inconsiderately, is irrevocable, but that its affirmative rejection, no matter how deliberate or how often repeated, may at any time be overridden. Upon this theory, a proposal for amending the Federal Constitution can never be *defeated,* since votes of rejection, though affirmative in form and buttressed with statements of the reasons for rejection, are treated as no votes at all, having no more effect than complete inaction on the part of the rejecting State.

The first person to suggest this doctrine was Governor Bramlette, of Kentucky, in his message to the General Assembly of March 1, 1865. The Assembly had rejected the Thirteenth Amendment to the Federal Constitution and sent it to the Governor for his approval or disapproval, conceiving that this was necessary, as in the case of legislation. The Governor, although favoring the Amendment, declined to return the resolution of rejection with his dissent, on the ground that the action of the Legislature was complete without his approval. In his message to that effect, he took occasion to express his dissatisfaction with the action taken by the Legislature and his opinion that its rejection did not preclude future ratification, saying:

"Nothing but ratification forecloses the right of action. When ratified all power is expended. Until ratified the right to ratify remains."

But it was Judge Jameson who gave wide currency to this view in his work on "The Constitutional Conven-

tion." In the first edition of his book he said that, "although the subject (was) not free from difficulties," it was "probable" that Governor Bramlette's view would be accepted as the true construction of article V, adding (section 563) that:

> "it could hardly have been unintentional that the contingency .of rejection of the proposed Amendment by one or more States was left unprovided for and it would seem a stretch of power to interpolate into that article a provision that, if rejected by one legislature or by three-fourths or even all State legislatures, such action should be taken to be definitive."

At the time of the publication of the first edition of Judge Jameson's book, the Fourteenth Amendment had not been proposed by Congress, but, in subsequent editions of his book, he leans heavily upon the action of Congress in accepting the votes of Ohio and New Jersey upon that Amendment, as described above.

So far as concerns the precedent set by Congress in connection with the adoption of the Fourteenth Amendment, its view is authority for the proposition that a State which has once ratified an amendment has exhausted its power .and cannot thereafter reverse its stand. On the other hand, when it comes to the counting of the votes of Georgia and the two Carolinas, the avowed justification of this was not that those States could ratify despite their previous rejections, but that their previous rejections were void because the then governments of those States were illegal and their Legislatures were without authority to act at all.

The only ground put forward by Judge Jameson in the first edition of his book for the theory that a vote of rejection may be disregarded at any time is that, since Article V does not mention the rejection of a proposal for amendment, but mentions only ratification, it must be concluded that rejections were not in contemplation and consequently were not authorized. The language of Article V is that a proposed amendment shall become part of the Constitution "when ratified by the legislatures of three-fourths of the several States, or by conventions in three-fourths thereof." Judge Jameson says that it would be "a stretch of power to interpolate into that Article a provision that, if rejected by one legislature or by three-fourths or even all State legisla-

tures, such action should be taken to be definitive.''
Certainly, had the framers of the Constitution enter-
tained so unique a theory, they would have adopted
language more clearly expressing their intention. It
is hardly consonant with common sense to say that an
amendment, once proposed for ratification, could never
be rejected. The very purpose of proposing an amend-
ment must be to poll the sentiment of the various States
on the question. It would be an anomaly if that senti-
ment could be expressed effectively in only one way.
We can see no reason for attaching less dignity to the
expression of the sovereign will of the State in rejecting
an amendment than is attached to its action in ratifying
such an amendment. It would be a singular thing to say
that rejections are allowed, but when they occur they
are to be treated as nonexistent. Evidently, the Supreme
Court of the United States did not accord with this view
when it said, in the National Prohibition Cases (Rhode
Island v. Palmer), 253 U. S. 350, 386, 40 S. Ct. 486, 488,
588, 64 L. Ed. 946:

> ''The referendum provisions of state Constitu-
> tions and statutes cannot be applied, consistently
> with the Constitution of the United States, in the
> ratification *or rejection* of amendments to it.''
> (Italics ours.)

In a speech delivered in the United States Senate on
February 22, 1870, regarding the adoption of the Fif-
teenth Amendment, Senator Garrett Davis, of Kentucky,
in replying to an argument advanced by the Senator
from New York, said (Congressional Record, Forty-
First Congress, Second Session, p. 1480):

> ''The honorable Senator's argument upon the
> first branch of his proposition I thought powerful
> and conclusive; but when he contended that this
> power of a State to act upon a proposed amendment
> to the Federal Constitution was a power to ratify,
> and imported no power to reject, I think he was
> widely from the true principle and widely from
> logic. How long shall it be before a Legislature that
> has rejected it? How long shall it be an open ques-
> tion? Twenty years? Fifty years? How long?
> Where is there any principle or provision of the
> Constitution that would so protract the question be-
> fore a State convention or State Legislature acting
> upon the subject of a proposed amendment? There
> is none. There is not a syllable of language from

which such a power can be inferred. It does not exist. When the subject is submitted to a State for its action, whether it be by its Legislature or its convention, it is for a single action; it is but for one action. The action of acceptance is no more extensive than the action of rejection; it has no more validity or effect. The effect of either mode of action is to exhaust the power of the State over that proposed amendment, and it can never come before that State again in any form whatever unless it comes before it in the form of a new proposition to amend the Constitution.''

It is true that Mr. David K. Watson, in his work on the Constitution, volume 2, p. 1318, argues in support of the position that a rejection of an amendment by a State is not final, but may be followed by ratification. He suggests that there is an analogy between the processes of amending the Constitution and that of making laws, and would apply to the former the familiar rule that one Legislature may repeal any act of a former Legislature. It seems obvious that such an analogy will not hold. Logically, this view would require that no more finality be accorded a ratification than a rejection. As pointed out by Mr. Justice Day in Hawke v. Smith, supra, action taken by a state Legislature under the Federal Constitution is not legislation within the proper sense of that word. This is made very clear in an analogous situation presented to the United States Senate concerning the contest over the election of Senator Faulkner of West Virginia in 1887. It may be said in passing that the opinion of the Senate Committee in this matter is likewise a complete answer to appellants' fourth contention set out above.

Mr. Daniel B. Lucas was appointed on March 5, 1887, by the Governor of West Virginia to the seat in the Senate left vacant by the expiration of the term of Senator Johnson N. Camden on March 3, 1887. On December 5, 1887, the President pro tempore of the Senate presented the certificate of the appointment to hold the office ''until the next meeting of the legislature of said state having authority to fill'' the vacancy occasioned by the expiration of Senator Camden's term. On the same day the President pro tempore also laid before the Senate the credentials of Charles A. Faulkner, chosen by the Legislature of West Virginia a Senator for the term beginning March 4, 1887. Mr. Lucas pro-

tested against these latter credentials, and Senator Hoar moved that Mr. Faulkner's case be sent to a committee for investigation, and it was so ordered. The report of this committee may be found in Hinds' Precedents of the House of Representatives, vol. 1, sec. 632. The report sets out the provision in the Constitution (Article I, secs. 3 and 4) for electing Senators. Section 3 of Article I provides that, if vacancies occur while the state Legislature is not in session, the Executive may make temporary appointments until the next meeting of the Legislature. The report stresses the point that each House shall be the judge as to whether one has the proper credentials to hold his seat. Congress is given the power by the Constitution to prescribe the time and manner of electing Senators, citing the case of Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717.

The Constitution of West Virginia provided that: "The Legislature shall assemble at the Seat of Government biennially, and not oftener, unless convened by the Governor. The first session of the Legislature, after the adoption of this Constitution, shall commence on the third Tuesday of November, 1872; and the regular biennial session of the Legislature shall commence on the second Wednesday of January, 1875, and every two years thereafter, on the same day." (Art. VI, sec. 7). Article VII, sec. 7, is the section that is similar to section 80 of the present Kentucky Constitution. It reads: "The Governor may, on extraordinary occasions convene, at his own instance, the Legislature; but when so convened, it shall enter upon no business except that stated in the proclamation by which it was called together."

Mr. Faulkner was not elected to the Senate until a special session of the Legislature was called by the Governor, soon after the 5th of March, 1887. This session was called to consider eight specified objects, none of which was the election of a Senator. Having set forth the facts, the report then discusses two questions arising in the case:

First, as to the action of the Legislature. Was the body which sat in pursuance of the Governor's call a Legislature in the constitutional sense? Mr. Lucas claimed that, since it was not called to elect a Senator, if it did elect a Senator, then it was not a Legislature, for it was violating the Constitution of the State. How-

ever, the Senate committee did not agree with this argument, for, it pointed out, the body passed upon legislation concerning the eight specified objects, as a Legislature, and it could surely pass upon a matter of duty imposed upon it by the Constitution of the United States, which is the supreme authority of the land. It points out that, where the State Constitution conflicts with the Federal Constitution, the latter must prevail. To this first question, the committee held that the special session of the Legislature could elect Mr. Faulkner even though such an election was not one of the purposes for calling same.

The second question was as to the qualifications of Mr. Faulkner. The issue on this point is not pertinent here.

The report, which was evidently written by Senator Hoar, an able constitutional lawyer, says:

"It is claimed by Mr. Lucas that, as this body was not permitted to enter upon any legislative business except such as related to the eight matters set forth in the call, it was not a legislature, but was a body deriving its power from the will of the executive, and so was exerting a certain executive or quasi executive function something like that which is exercised by the Senate in giving its assent to the nomination of public officers.

"But it seems to us that this view cannot be supported. In the first place, the body is expressly declared by the constitution of West Virginia itself to be a legislature. In the next place, the function which it exercised in making enactments upon the eight great subjects mentioned in the call of the governor is clearly a legislative function. * * *

"It is difficult to conceive of any definition of the word 'legislature' which would not include a body capable of passing and actually passing such enactments as these [subjects in call]. They can be binding on the people of the Commonwealth only as legislation. They would be subject to be construed and enforced by the courts of that State only in their character as laws.

"But it seems to the committee that the construction of the State constitution upon which the above argument is based, is one which will not bear

examination. When that constitution provided that the legislature so convened in extraordinary occasions 'should enter upon no business except that stated in the proclamation by which it was called together,' the people must be presumed to have had in mind business to be transacted under authority of the State constitution, and not to have intended to prohibit the performance of duties imposed upon it by the supreme authority of the Constitution of the United States.

"If the argument be sound that a legislative body which is prohibited from entering upon certain classes of business, or which is confined to certain classes of business clearly legislative in their character, is no legislature in the constitutional sense, its logic would require us to declare that the legislature of every state whose bill of rights excludes it from large domains of legislation is no legislative body. If, under the same provision of the Constitution of the United States, the act of Congress had fixed a day for holding elections for Representatives to Congress, and the State constitution or laws should prohibit the assembling of the people for such elections on the day so fixed, it would, we suppose, be held clear that the act of the State would be void and the authority of the act of Congress would prevail.

"We cannot see any difference between such prohibition of a State constitution applicable to the constitutional electors of Senators, who are members of the State legislature, and the constitutional electors of representatives, who are a body of electors authorized to vote for members of the most numerous branch of the State legislature.

"We are therefore clearly of the opinion that the election of Mr. Faulkner at the special session of the legislature of West Virginia was valid."

If further authority is necessary to rebut the theory of Mr. Watson that there is an analogy between the action of the state Legislature in performing its functions under the Federal Constitution and ordinary legislation, we find it in the cases cited by appellees for the following proposition quoted from their brief:

"The ratification of a proposed amendment to the Federal Constitution by the State Legislature

*is not legislation* and does not require any previous proclamation for consideration and action, if the Legislature is in fact in session, whether General or Special.'' (Italics ours.)

Appellees refer to the following cases supporting this proposition: Leser v. Garnett (1922) 258 U. S. 130, 42 S. Ct. 217, 66 L. Ed. 505; National Prohibition Cases (Rhode Island v. Palmer), 253 U. S. 350, 386, 40 S. Ct. 486, 488, 588, 64 L. Ed. 496; State ex rel. Tate v. Sevier (1933) 333 Mo. 662, 62 S. W. (2d) 895, 87 A. L. R. 1315, certiorari denied State v. Sevier, 290 U. S. 679, 54 S. Ct. 102, 78 L. Ed. 586; Prior v. Noland, 68 Colo. 263, 188 P. 729, 731; In re Opinions of Justices, 118 Me. 544, 107 A. 673, 5 A. L. R. 1412.

We think the conclusion is inescapable that a State can act but once, either by convention or through its Legislature, upon a proposed amendment; and, whether its vote be in the affirmative or be negative, having acted, it has exhausted its power further to consider the question without a resubmission by Congress. If we should be in error in this conclusion—and, of course, our position on this question must bow to the views of the Supreme Court of the United States when they are expressed thereon—there are nevertheless the additional questions as to whether or not rejection by more than one-fourth of the States at one time did not terminate the ''offer'' of the Amendment by Congress, and whether or not, under the decision of the Supreme Court in Dillon v. Gloss, supra, more than a reasonable time had elapsed between the submission of the Amendment and the alleged ratification by Kentucky. Accepting the analogy between the submission of an amendment by Congress and the making of an offer, under the principles of the law of contracts, the conclusion that the Amendment was no longer before the States at the time of the purported ratification by Kentucky in 1937 seems inevitable. The proposition is succinctly stated in a letter published in the July, 1934, number of the American Bar Association Journal, written by Mr. Frank W. Grinnell, of the Boston bar. He says:

''Since the Constitution requires a vote of three-fourths of the several states to ratify an amendment, it requires only one state more than one-fourth to defeat ratification and it seems to follow as a matter of common sense and orderly procedure from the decision just referred to (Dillon

v. Gloss) that the rule must work both ways and that when thirteen states (one more than one-fourth of the forty-eight states) have voted not to ratify an amendment it is no longer pending, but is defeated until Congress sees fit to resubmit it. Otherwise, a state could change its mind in one direction after a final vote of the necessary number of states, but not in the other direction.

"In the case of the Child Control Amendment, not only thirteen but twenty-six states voted not to ratify. I submit that it was clearly defeated. If this is not so, states might be subjected to constant agitations over defeated amendments after the citizens considered them defeated and were off their guard.

"When an amendment is submitted by Congress, the process of ratification is really a debate among the several states. If it is true, as I believe it to be, that at this time the Child Control Amendment is no longer before the states, the action of those states which have attempted to ratify it during 1933 has no legal effect. * * *

"If we are to have deliberative government in this country on such important matters as amendments to the Constitution of the United States, is it not essential that we should maintain the rules of orderly procedure similar to those in our legislatures under which after a matter has been definitely defeated by the requisite majority it can not be considered again unless it is resubmitted in the usual way—in this case by Congress."

In addition to the fact that the Amendment before us was rejected by more than one-fourth of the States—indeed, it appears from the record that twenty-one of the States in 1926 had not only rejected the Amendment, but the resolutions thereon were duly certified to the Secretary of State of the United States, and thirty-seven States in all had actually rejected—there is the question, noted in Dillon v. Gloss, supra, from which we have quoted above at length, of whether or not more than a reasonable time has elapsed since the original submission of the Amendment. Assuming that the rejection of the Amendment by more than one-fourth of the States did not ipso facto terminate the proposal and require a resubmission by Congress if further action

was to be taken, it may at the very least be doubted if twelve and a half years is a reasonable time within which to act. Leaving out of consideration the first ten Amendments to the Constitution (the "Bill of Rights"), the time required for the adoption of the eleven succeeding Amendments was respectively as follows:

Eleventh: 3 years, 4 months.
Twelfth: 9 months.
Thirteenth: 10 months.
Fourteenth: 2 years, 1 month.
Fifteenth: 1 year, 1 month.
Sixteenth: 3 years, 6 months.
Seventeenth: 1 year, 2 weeks.
Eighteenth: 1 year, 1 month.
Nineteenth: 1 year, 2 months.
Twentieth: 11 months.
Twenty-first: 9 months, 2 weeks.
Average Time: 1 year, 6 months.

Since the decision in Dillon v. Gloss, supra, two proposals for amending the Constitution (since adopted as the Twentieth and Twenty-First Amendments) each contained a limitation of seven years. The power of Congress thus to fix a reasonable limitation upon the time within which an amendment should remain before the States having been sustained in Dillon v. Gloss, and Congress having attached a limitation of seven years to its submission of both the Twentieth and Twenty-First Amendments, it does not seem improper to conclude that this is the period considered by that body to represent a reasonable time for the States to act. Certainly, seven years is not too short a time, in view of the history of previous Amendments as shown in the table above. Taking the instant Amendment iself, action had been taken in forty-two of the forty-eight States by the close of 1927. The fact that but one State (Colorado in 1931) acted between 1927 and 1933 indicates very strongly that general sentiment considered the proposition to be no longer before the people. It seems clear that the "reasonable time" during which the "offer" remained open necessarily expired at some time during the period of apparent abandonment between the end of 1927 and the revival of interest in 1933. Certainly, by any yardstick, more than a reasonable time had elapsed by January, 1937.

Concluding, as we must, that the petition in this case has stated a cause of action, we are nevertheless con-

fronted with the proposition urged on behalf of appellees to the effect that, since the Governor's certification to the Secretary of State of the United States is *fait accompli*, the case is moot to the extent that the court can grant no effective relief, even though it should proceed to make a declaration of rights under Civil Code of Practice, sec. 639a—1 et seq. Appellants justify the procedure which they have adopted in presenting the question as to the validity of the Amendment under the decision of the Supreme Court of the United States in Leser v. Garnett, 258 U. S. 130, 42 S. Ct. 217, 218, 66 L. Ed. 505, to the effect that an official notice to the Secretary of State, duly authenticated, that the Legislature of a given State had adopted a resolution of ratification of a proposed amendment to the Federal Constitution, is "conclusive on him," and that his proclamation certifying that he had received such notices from three-fourths of the States and that the amendment in question had therefore become a part of the Federal Constitution is "conclusive upon the courts." Under this decision, the claimed ratification of an amendment cannot be challenged after the proclamation by the Secretary of State of the United States. Obviously, therefore, if there is to be a judicial determination of the validity of the action taken by any State, it must occur during the interim following the action by such State and the date of proclamation by the Secretary. It is not questioned but that the Governor acted in a purely ministerial capacity in forwarding the certified copy of the resolution of the General Assembly, and it has been held that the Secretary of State acts ministerially in proclaiming an amendment under section 205 of the Revised Statutes of the United States (U. S. C. A. title 5, sec. 160). United States v. Colby, 49 App. D. C. 358, 265 F. 998, affirmed U. S. v. Hughes, 257 U. S. 619, 42 S. Ct. 169, 66 L. Ed. 400. The amendment becomes effective upon its ratification by the thirty-sixth State and does not await a proclamation by the Secretary of State to give it vitality. Dillon v. Gloss, supra. It is apparent, therefore, that the action of the Governor in forwarding the resolution of the General Assembly to the Secretary of State did not of itself add anything to the action of the General Assembly other than to make a record which was prima facie evidence of the action taken by Kentucky. It would be surprising to learn that a Governor might irrevocably commit his State to the adoption or rejection of a constitutional amendment by a mere certification to the Secre-

tary of State. We do not think that such a rule is to be implied from the decision in Leser v. Garnett, supra. Section 205 of the Revised Statutes of the United States (U. S. C. A. title 5, sec. 160) provides:

> "Whenever official notice is received at the Department of State that any amendment proposed to the Constitution of the United States has been adopted, *according to the provisions of the Constitution,* the Secretary of State shall forthwith cause the amendment to be published, with his certificate, *specifying the States by which the same may have been adopted,* and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States." (Italics ours.)

Surely, the Secretary of State must determine whether or not the certification by the Governor is "according to the provisions of the Constitution." If, as we conceive, the Amendment was no longer before the States at the time of the purported adoption by the General Assembly of Kentucky, then the certification by the Governor was a nullity and could and should be ignored by the Secretary of State.

If the certificate of the Governor showing the purported ratification by the State of Kentucky cannot be impeached, then, by the same token, the certificate of the Governor to the resolution of rejection, passed in 1926, and thereafter duly forwarded to the Secretary of State, is likewise not subject to question, and it would therefore be the duty of the Secretary of State to ignore the second certification. In both Leser v. Garnett, supra, and United States v. Colby, supra, the official notices in the Department of State were apparently regular in form and unchallenged at the time when the proclamation of the Secretary was made. It was held that those notices had created a presumption conclusive upon the Secretary of State that the Legislatures of the States from which they came had duly adopted resolutions of ratification. Certainly this presumption would attach to the record of rejection no less than the subsequent record of purported ratification, and it seems clear that a decision by a court having jurisdiction of the question would be binding as to the validity or invalidity of the record concerning a particular State.

In Miller v. Johnson, 92 Ky. 589, 18 S. W. 522, 13 Ky. Law Rep. 933, 15 L. R. A. 524, certain voters and

taxpayers, suing on behalf of themselves and others similarly interested, brought an action against the public printer and the Secretary of State to enjoin the former from printing the State Constitution just promulgated by the Constitutional Convention of 1891 and the latter "from preserving it in the state archives as the constitution of the state, and also asking that it be adjudged not to be such, but spurious and invalid." In determining that case, the court said:

"It is urged upon the part of the appellees that the appellants' suit is based upon a speculative idea of injury, and that no such special, particular, and substantial damage is impending to them as to authorize it; also, that the action does not lie against the appellees, because the printing or preservation of the instrument will not add to or detract from its validity. We waive the consideration of these objections, because, even if entitled to it, the importance of this controversy to the state requires a decision upon the merits."

Appellees have waived any question as to the right of the appellants to maintain this suit, Board of Park Commissioners v. Speed, 215 Ky. 319, 285 S. W. 212; and, aside from this, "the importance of this controversy to the state requires a decision upon the merits." The fact that the Governor certified the resolution to the Secretary of State *after* this suit was filed did not deprive the courts of the jurisdiction already attached to determine the controversy and to make a declaration of rights under Civil Code of Practice, sec. 639a—1 et seq. McHugh v. Louisville Bridge Co., 65 S. W. 456, 23 Ky. Law Rep. 1546; St. Louis & S. F. R. Co. v. Cross, 171 F. 480; 32 C. J. 77.

In 32 C. J. 24, the text, supported by numerous authorities, says:

"Where defendant has fully completed the act sought to be restrained, after the filing of the bill but before the issuance of any order or decree, the court has power to compel by mandatory injunction the restoration of the former condition of things, and thereby prevent the gaining of an advantage by reason of the wrongful act, provided plaintiff has been guilty of no wrongful acquiescence or delay. Where defendant does an act which the bill seeks to enjoin, he acts at his peril and is subject to the

power of the court to compel a restoration of the status, or to grant such other relief as may be proper under the particular circumstances of the case."

Under the circumstances here presented, a mandatory order directing the Governor to notify the Secretary of State of the decision of this court would be entirely unnecessary. The court itself, with equal effect, may direct its clerk to certify a copy of its judgment concerning the status of the Amendment without the necessity of directing action by a co-ordinate branch of the state government.

Since the question is before us on demurrer to the petition, and appellees may desire to assert some further defense, the case will have to be returned to the circuit court, with directions to overrule the demurrer to the petition, and for such further proceedings as are not inconsistent with the views herein expressed.

Judgment reversed.

Whole court sitting.